**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| **SOONHEE KIM** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 17-16180** |
| | * | |
| **KAMAU BAKARI FERDINAND** | * | **SECTION "L" (5)** |


## FINDINGS OF FACT AND CONCLUSIONS OF LAW


### I.    INTRODUCTION

This case involves a claim brought under the Hague Convention on the Civil Aspects of International Child Abduction.  Soonhee Kim ("Petitioner" or "Mother") is the mother of L.J.F. (born in 2007) and A.J.F. (born in 2009) (the "children").  She petitions this Court to return her two children to Thailand, asserting that on or before August 13, 2017, Kamau Bakari Ferdinand ("Respondent" or "Father"), the children's father, wrongfully retained them in Louisiana where they now remain.

Before the Court is Petitioner's Verified Complaint for Return of Children to Thailand. This matter was tried before the Court, sitting without a jury, on February 1, 2018.  The purpose of this trial was not to determine the children's parental custody, but rather to identify the children's habitual residence:  Thailand or the United States.  Having considered the evidence admitted at trial and the arguments of counsel, the Court hereby issues its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.     JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this matter arises under the Hague Convention ("Convention") and International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601, *et seq.*, the implementing legislation.  Venue is proper because the Court "is authorized to exercise its jurisdiction in the place where the child[ren] [are] located at the time the petition is filed," which was within the jurisdiction of the United States District Court for the Eastern District of Louisiana.  *See* 42 U.S.C. § 11603(b).

## III.    PROCEDURAL HISTORY

On August 22, 2017, the Mother submitted applications—for L.J.F. and A.J.F.—to the Thai Central Authority under the Hague Convention on the Civil Aspects of International Child Abduction for the return of her children from the United States to Thailand.  *See* Pet'r Ex. 14.

On December 9, 2017, Petitioner filed the instant complaint before the Court.  Petitioner requests the Court to order Respondent to return the children to Thailand and to pay Petitioner's legal fees and necessary expenses in pursuing this action.

On December 12, 2017, at the Court's direction, the United States Marshal served Respondent with Petitioner's complaint.  The Court scheduled a show cause hearing for December 19, 2017.  At the show cause hearing, the parties agreed on a trial date of January 26, 2018.

On January 22, 2018, after Petitioner made several motions *in limine* and after inclement weather in New Orleans that had shut down most of the city, Respondent filed a motion to continue trial so counsel can have additional time to prepare.  The Court granted Respondent's motion and continued trial to February 1, 2018.  On the same date, the Court also denied Petitioner's motion to preclude a clinical psychologist from testifying as an expert and treating physician, but reserved Petitioner's right to call a rebuttal expert witness.

On January 26, 2018, the Court conducted a hearing by telephone regarding Petitioner's motion *in limine* to exclude video recordings of the Mother and children. The Court granted in part and denied in part Petitioner's motion, holding that the portion of the recordings containing the Mother's statements is admissible under Federal Rule of Evidence 613 as prior statements and may be used in connection with credibility issues. The portion of the recordings containing the children's statements, however, is inadmissible hearsay under Federal Rule of Evidence 802. After the Court heard the parties' motions *in limine*, trial commenced on February 1, 2018 and lasted approximately seven hours.

## IV. FINDINGS OF FACT

In Hague Convention cases, in which the Court's determination of the children's habitual residence turns on the intention of the parents, the district court often "face[s] . . . a choice as to whom it [finds] more believable." *Eubanks v. Eubanks*, No. CV 17-1217, 2017 WL 3235446, at *1 (E.D. La. July 31, 2017) (citing *Yang v. Tsui*, 416 F.3d 199, 203 (3d Cir. 2005)). During the bench trial on this petition, the Court had the opportunity to observe the demeanor of the Mother and Father, as well as other witnesses, and to hear their testimony and, on that basis, assess their credibility. The trial allowed the Court to formulate the following findings of fact and conclusions of law.

### A. Parents

1.  The Mother and Father first met in Japan in 2002 and began dating shortly thereafter. In 2006, the parties married in Kawasaki, Japan.

2.  The Mother is a citizen of the Republic of Korea, but was born in and lived most of her life in Japan. The Mother holds special permanent resident status in Japan. The Mother has no immigration status in the United States. She is not a citizen, permanent resident, or

immigrant visa holder in the United States.  The Mother is permitted to enter the United States as a short-term visitor under the visa waiver program.

3.      The Father is a citizen of the United States.  Prior to 2017, he lived abroad in Asia for almost eighteen years.

4.      The Mother and Father both continued to work in Japan after their children's births in 2007 and 2009.  The Mother is a director and partner at a venture capital firm, and the Father is an English teacher.

5.      In 2011, the Mother's company offered her a promotion in the company's Bangkok, Thailand office.  In December 2011, the parties jointly decided to move the family to Thailand, and resided together in the Sukhumvit District in Bangkok.

6.      After the family arrived in Thailand, the Father enrolled in an educational program at a local university.  The Father completed the curriculum in 2016.  The Father did not work while he was attending school.  He then started working as a part-time English teacher in 2016.

7.      While in Thailand, the Mother, Father and children all held Thai visas.  The family lived transient lifestyles while in Asia.  They often travelled to Japan, Singapore, Taiwan, and the United States.  Nonetheless, from 2011 until mid-2017, their lives, as well as their children's, centered in Bangkok, Thailand.  The family leased and lived in a luxury condominium in Bangkok.

8.      The Father's extended family—his mother, father and siblings—lives in New Orleans, and in an effort to keep connected, the Respondent and/or Petitioner usually vacationed annually in New Orleans with the children.

9.      In 2016, after the family lived in Thailand for nearly five years, the parents began to experience marital discord.  During this time, they initially resided in the same apartment unit, but slept in separate bedrooms.  Eventually, however, the Father moved out, and rented another apartment in Bangkok.  The Mother and Father lived geographically close to one another—only two short subway stops away—to allow equal access to the children.

10.     When the parents parted, they agreed on a schedule for the children to spend approximately equal time with both parents.  The children resided with the Mother overnight on Fridays, Saturdays, Sundays, and Mondays, and the children stayed with the Father overnight on Tuesdays, Wednesdays, and Thursdays.  The family operated on this schedule through 2016 and into 2017.

11.     In 2017, the Father told the Mother he was thinking about finding a job in the United States and would be interviewing with a potential employer during a trip with the children to see their extended family in New Orleans.  When the Father was planning this trip to the United States, the Mother had advised the Father that she would not agree for the children to travel to the United States unless the Father provided proof that he had purchased return plane tickets for the children to return to Thailand at the end of the vacation.

12.     On May 5, 2017, the Father forwarded the Mother an e-mail confirmation of the children's roundtrip ticket from Bangkok, Thailand to New Orleans, Louisiana.  *See* Pet'r Ex. 8 & 9.  The e-mail confirmation from Delta Airlines provided a departure date of June 29, 2017 from Bangkok and a return date of August 13, 2017.  The children's paternal grandfather purchased the tickets.

13.     On June 29, 2017, the children departed Thailand with the Father's sister and arrived in New Orleans, Louisiana.

14. On August 13, 2017, the Father did not return the children to Thailand, and indicated to the Mother in an e-mail that he believes it is a good idea for them to stay. The Father said the children have outgrown the life Bangkok has to offer.

15. The Mother earns approximately $100,000.00 USD per year. The Father earns approximately $36,000.00 USD per year.

**B.    Children**

16. L.J.F., the parents' first child, was born in November 2007 in Kawasaki, Japan. L.J.F. is now ten-years old.

17. A.J.F., the parents' second child, was born in June 2009 in Yokohama, Japan. A.J.F. is now eight-years old.

18. The children lived in Japan until 2011, when the parents decided to relocate to Thailand.

19. The children hold special permanent resident status in Japan by virtue of the Mother's status in Japan and the children's birth in Japan. The children also hold United States citizenship by virtue of the Father's United States citizenship. The children also hold Thai visas, as dependents on the Mother's Thai visa, which allow them to live in Thailand.

20. From 2011 to mid-2017, the children attended pre-school and elementary school in Bangkok. They were actively involved in extracurricular activities in Thailand, including drama classes, chess competitions, taekwondo classes, and Japanese classes. The children also received medical care in Thailand, where they received vaccination for school enrollment.

21. The Father and children took annual or semi-annual trips to the United States, often for the purpose of visiting the children's paternal grandparents in New Orleans,

Louisiana. The children's paternal grandparents paid for some of those trips. While in New Orleans, the Father and children reside with the grandparents.

22. Since arriving in New Orleans in June 2017, the children have enrolled in a local school and currently live at their paternal grandparents' home with their father. The children have also enrolled in extracurricular activities in New Orleans, such as piano and ballet lessons.

## V. CONCLUSIONS OF LAW

### A. <u>The Hague Convention</u>

23. As the United States Supreme Court has recognized, "[t]he Hague Convention on the Civil Aspects of International Child Abduction generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." *Chafin v. Chafin*, 568 U.S. 165, 168 (2013). ICARA, 22 U.S.C. §§ 9001–08, is a codification of the Hague Convention.

24. The Convention was adopted in 1980 in response to the emerging problem of international child abductions perpetrated by parents, guardians, and close family members. *Mozes v. Mozes*, 239 F.3d 1067, 1069–70 (9th Cir. 2001).

25. The Convention specifically was adopted to address "the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2001). "The Convention seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the laws of one Contracting State are effectively respected in the other Contracting States.'" *Id.* (quoting Art. 1, S. Treaty Doc. No. 99-11, at 7). Furthermore, the drafters of the Convention sought to "discourage forum shopping in international child-custody disputes when it takes the form of removing a child

to the jurisdiction preferred by one of the parents." *Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006) (citations omitted).

26.    The Hague Convention's stated purpose is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (quoting Hague Convention, Preamble).

27.    "The Convention was designed to 'restore the pre-abduction status quo.'" *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)).  In *Sealed Appellant*, the Fifth Circuit explained, "The Explanatory Report is recognized as the official history, commentary, and source of background on the meaning of the provisions of the Convention."  *Id*. at 343 (citing Pub. Notice 957, 51 Fed. Reg. at 10503).  The Explanatory Report to the Hague Convention describes:

> [F]rom the Convention's standpoint, the removal of a child by one [parent with custody] without the consent of the other, is . . . wrongful, and this wrongfulness derives . . . from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise . . . *[The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future . . . it seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.*

*Id.* (alterations and emphasis in original) (quoting Elisa Perez-Vera, Explanatory Report:  Hague Convention on Private International Law, ¶ 71, at 447–48 ("Explanatory Report").

28.    At the core of these procedures is the Convention's return remedy:  When a child under the age of sixteen has been wrongfully removed from, or retained outside of, the country of his or her habitual residence, the country to which the child has been brought must

"order the return of the child forthwith," unless certain exceptions, or affirmative defenses, apply. *Abbott*, 560 U.S. at 8 (citing Hague Convention, arts. 4, 12). In this case, both children fall under the age of sixteen: L.J.F. is ten years old and A.J.F. is eight years old. *See* Resp't Ex. 9 & 10.

29. The Hague Convention came into effect in the United States in 1988, and was ratified between the United States and Thailand on April 1, 2016. *See* U.S. Hague Convention Treaty Partners, *available at* https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited February 3, 2018).

## B. International Child Abduction Remedies Act ("ICARA")

30. "In 1988, Congress enacted ICARA, the legislation implementing the Convention in this country." *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 616 (W.D. Tex. 2010). The provisions of ICARA "are in addition to and not in lieu of the provisions of the Convention." 42 U.S.C. § 11601(b)(2).

31. Under ICARA, anyone seeking the return of a child allegedly wrongfully removed to or retained in the United States may commence a civil action in any court that has jurisdiction over the action and the place where the child is located. *Id.* at § 11603(b). Once such an action is filed, the 'court in which [the] action is brought . . . shall decide the case in accordance with the Convention." *Id.* at § 11603(d).

32. "Though the Convention is silent with regard to burdens and standards of proof, ICARA provides that the petitioner seeking the return remedy has the burden of proving by a preponderance of the evidence that 'the child has been wrongfully removed or retained within the meaning of the Convention." *Saldivar*, 879 F. Supp. 2d at 617 (quoting 42 U.S.C. § 11603(e)(1)(A)).

33. As the Fifth Circuit explained in *Larbie v. Larbie*:

The Convention uses the phrases "wrongful removal or retention" and "right of custody" as terms of art. A removal or retention is "wrongful" under the Convention when (1) "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and" (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." The Convention considers "rights of custody [to] include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." These rights differ from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence."

690 F.3d 295, 307 (5th Cir. 2012) (citations omitted).

34. Further, as explained by the Ninth Circuit in *Mozes*:

A court applying this provision must therefore answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

239 F.3d at 1070.

35. It is the Petitioner's burden to establish these elements by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1). Accordingly, to establish a *prima facie* entitlement to the return remedy, Petitioner must show by a preponderance of the evidence that (1) Thailand was the children's habitual residence immediately before the Father removed them and retained them in the United States; (2) the Mother has "rights of custody" under Thai law; and (3) the Mother was exercising her custody rights at the time the Father wrongfully removed or retained the children in the United States. *See Eubanks*, 2017 WL 3235446, at *7. The Court will address each prong in turn.

C.    **Habitual Residence**

36.    The threshold question before the Court is to determine the children's habitual residence before their removal and retention.  *Larbie*, 690 F.3d at 310 (citing *Mozes*, 239 F.3d at 1072).

37.    The Hague Convention operates to restore the status quo as it existed before the wrongful removal of a child by establishing procedures for the return to the child's country of "habitual residence" before the removal.  *See* Hague Convention, arts. 3, 12, reprinted at 51 Fed. Reg. 10498–99); H.R. Doc. No. 100–525, at 5 (1988) ("[t]he Convention is designed promptly to restore the factual situation that existed prior to a child's removal or retention."); *Sealed Appellant*, 394 F.3d at 344; *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

38.    Thus, the first question before the Court is to determine whether the children habitually resided in Thailand prior to the alleged wrongful retention in Louisiana.  Because the Mother is requesting that the children be returned to Thailand, she bears the burden to prove by a preponderance of the evidence that the children, at the time they were removed and retained in the United States, were habitual residents of Thailand.  *See Eubanks*, 2017 WL 3235446, at *8.

39.    The Convention does not define the term "habitual residence."  *Id.*  Instead, the term is to be interpreted according to the ordinary and natural meaning of the two words.  *See Labrie*, 690 F.3d at 310 ("[A]lthough the term 'habitual residence' appears throughout the various Hague Conventions, none of them defines it." (alteration in original) (quoting *Mozes*, 239 F.3d at 1071)).  "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case."  *Id.*  "At core, however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of its parents, who usually effect the removal or retention giving rise to a Convention

petition." *Larbie*, 690 F.3d at 310 (citing *Mozes*, 239 F.3d at 1072–73; Explanatory Report ¶¶ 57–58).

40.     Although courts use varying approaches, each placing different emphasis on the weight given to the parents' intentions to determine a child's habitual residence, the Fifth Circuit, in *Larbie*, explicitly joined the majority of circuits in adopting "an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Id.* "This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age." *Id.* The Fifth Circuit further explained that the parents' intentions should be dispositive in situations in which "the child is so young that 'he or she cannot possibly decide the issue of residency.'" *Id.* (quoting *Whiting*, 391 F.3d at 548–49 (citing an English case that looked to parents' intentions because the child was "two and one-half years old at the time of her abduction.").

41.     "In such cases, the threshold test is whether both parents intended for the child to 'abandon the [habitual residence] left behind.'" *Id.* at 310–11 (quoting *Mozes*, 239 F.3d at 1075). "Absent shared intent, 'prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally to this conclusion.'" *Id.* at 311 (quoting *Mozes*, 239 F.3d at 1082).

42.     As the Fifth Circuit noted, "when 'the child's initial move from an established habitual residence was clearly intended for a specific, limited duration[,] . . . most courts will find no change in habitual residence.'" *Larbie*, 690 F.3d at 311 (quoting *Whiting*, 391 F.3d at 549 (alterations in original)). Here, the Mother has repeatedly asserted that she expected the children to return to Thailand after their summer visit to their grandparents' home in New Orleans. Very telling is the fact the Father, through the grandfather, purchased round-trip tickets

from New Orleans to Bangkok for the children.  *See* Pet'r Ex. 8 & 9.  At trial, the Father confirmed this round-trip plan for the children:

> **Mr. Cullen:**     So they both had return tickets to Thailand on
>                     August the 13th, 2017, yes or no?
>
> **Mr. Ferdinand:**  They did.

From the testimony and evidence at trial, the Court finds that the shared intent of both parents was not to relocate the children from Bangkok, Thailand to New Orleans, Louisiana.  Instead, the Father initially communicated to the Mother that the New Orleans trip was a vacation to see the children's grandparents—consistent with past summer visits.  Before this trip, both children resided in Thailand for the majority of their lives:  six years.  Both children went to school in Thailand and lived with their parents there.  Accordingly, the Court concludes that the parents never agreed on relocating—or changing—the children's habitual residence from Thailand to the United States.

43.     The Father contends that Thailand was never intended to be a permanent residence.  And the Court agrees that this family is quite international and transient; their travels are impressive.  From this fact, the Father claims that the parties previously discussed potentially living somewhere other than Thailand at some point in the future, and therefore Thailand cannot be the children's habitual residence.  But being habitually resident in a place does not mean that it is "where you plan to leave your bones."  *Berezowsky v. Ojeda*, 765 F.3d 456, 467–68 (5th Cir. 2014) (quoting *Mozes*, 239 F.3d 1074).  That is true, especially in this case.  Because the children and parents travel so often, it is quite difficult to identify their "home."

44.     Nevertheless, Thailand makes the most sense among the three frontrunners: Japan, Thailand, and the United States.  The children were born in Japan, but relocated to Thailand when L.J.F. was four years old and A.J.F. was two years old.  From then on, they spent six

consecutive years in Bangkok, Thailand, where they enrolled in school and where their parents worked or attended further education. In contrast, before the Father removed the children to New Orleans on August 13, 2017, the children's visits to the United States were often short and during the summer or winter. The children's trips to the United States were vacations. Accordingly, the Court finds that the children's habitual residence is Thailand.

45. The Father further argues that both parents had planned to allow the children stay until junior high or high school. The Court finds this to be a unilateral assertion by the Father because the Mother never firmly agreed to such plan. "Mere retention in another country . . . or intentions that are made 'manifest and definitive' only after the child has left its country of origin are generally insufficient to establish intent to change a child's habitual residence." *Larbie*, 690 F.3d at 311 (citing *Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010)). The Father points to a Skype call between the parties, which resulted in a recording unbeknown to the Mother at the time of the conversation. At the time of the recording and conversation, the Father had already retained the children in New Orleans. The Mother, in the process of negotiating for the children's return, suggested as a possibility for the children to go to the United States for junior high or high school.

| | |
|---|---|
| **Ms. Nguyen:** | Did you state that to Mr. Ferdinand, junior high and see about high school, junior high? |
| **Ms. Kim:** | Yes. |
| **The Court:** | You can answer yes or no, but then explain if you need to explain. |
| **Ms. Kim:** | Okay. It was -- |
| **Ms. Nguyen:** | Your answer was yes? |
| **Ms. Kim:** | Yes, I said that because I was under pressure and he already kept the kids over there and it |

14

> was after I discover he refuse to return the
> kids. So I try to negotiate as much as possible
> and then again I said I would say anything
> to return the kids first and I told him and he
> needs to return the kids first and we talk about
> it and then again nothing was agreed.

46.     Respondent cannot establish a change in the children's habitual residence simply by pointing to this exchange between him and Petitioner. At trial, Petitioner clearly stated that she never consented to the children's move and her main intention was to reunite with her children. The Court cannot accept Respondent's argument that this constitutes an agreement to retain the children in the United States until junior high or high school. "While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone." *Mozes*, 239 F.3d at 1078. And that is precisely what Respondent has: a one-sided arrangement for the children to stay in the United States, albeit the Mother's objection and the fact that the children have been living in Thailand for six years.

47.     At trial, Respondent also defined "home is wherever family is." From his theory and cliché, Respondent argued that because his family—meaning his mother, father and siblings—is in New Orleans, by extension, New Orleans is also where the children's habitual residence is located. This is a strained argument unsupported by law. "[H]ome isn't built in a day. It requires the passage of an appreciable period of time one that is sufficient for acclimatization." *Mozes*, 239 F.3d at 1078 (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1402 (6th Cir. 1993)). The Court finds that the children's home was built in Thailand, where the parents leased a condo, secured jobs, enrolled the children in school and extracurricular activities, and where the paternal grandparents visited them, *inter alia*. On the contrary, the parents never jointly rented, leased or purchased a residence in the United States, and only visited here for vacations.

48.     Respondent further argues that the children are well adjusted in New Orleans.  Perhaps this is true.  Clearly, their grandparents love them very much and would like them to reside in New Orleans.  But even though the children have seemingly accustomed themselves to New Orleans, with great support from their caring grandparents who are both accomplished medical professionals, the Fifth Circuit has cautioned courts not to equate this to establishment of habitual residence.   Again, rather than focusing on the child's contacts in the new country, the Fifth Circuit emphasizes settled parental intent:

> A more difficult question is when evidence of acclimatization should suffice to establish a child's habitual residence, despite uncertain or contrary parental intent.  Most agree that, given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there [may] be lingering parental intentions to the contrary.  The question is how readily courts should reach the conclusion that this has occurred.  Since the Convention seeks to prevent harms thought to flow from wrenching or keeping a child from its familiar surroundings, it is tempting to regard any sign of a child's familiarity with the new country as lessening the need for return and making a finding of altered habitual residence desirable.  Further, some courts regard the question whether a child is doing well in school, has friends, and so on, as more straightforward and objective than asking whether the parents share a "settled intent."  Despite the superficial appeal of focusing primarily on the child's contacts in the new country, however, we conclude that, in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned.

*Mozes*, 239 F.3d at 1078–79; *see also Eubanks*, 2017 WL 3235446, at *9.

49.     The vast support group the children have in New Orleans is great—but irrelevant to the question of habitual residence.   The grandparents obviously cherish their relationship with L.J.F. and A.J.F., having often journeyed to Japan and Thailand to visit them.  The grandparents even purchased a time-share property in Hawaii – with the purpose of shortening the travel time to see their son and granddaughters.  But these facts are relevant to custody and not

habitual residence. This is not a custody hearing. The focus here is on determining habitual residence. The children's support network in New Orleans is unrelated to the instant issue of determining habitual residence. The Court does not need to decide which parent is necessarily better for the children's upbringing.

50.     From the facts presented at trial, the Court concludes that the Mother has established that, before the removal of the children to New Orleans, the parties had a shared and settled intent to live with the children in Thailand. The Court further finds that the parents never reached an agreement for the children to stay in New Orleans, Louisiana after August 13, 2017. Accordingly, the Mother has met her burden of showing Thailand as L.J.F. and A.J.F.'s habitual residence. The Court now moves to the second prong of Petitioner's *prima facie* case: whether the Mother has custody rights under Thai law at the time of the retention.

### D.     <u>Custody Rights</u>

51.     A petitioner must show that he or she has "rights of custody" under the law of the habitual residence. *See Eubanks*, 2017 WL 3235446, at *7. In this case, the Mother must show that she has rights of custody under Thai law, which is defined under the Convention as "rights relating to the case of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a); *see Sealed Appellant*, 394 F.3d at 343.

52.     The Court may "take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decision which would otherwise be applicable." Hague Convention, art. 14; *see also* Fed. R. Civ. P. 44. The Court may consider affidavits of foreign law to establish rights of custody. *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000).

53.	At trial, the Court admitted into evidence the Mother's affidavit of Thai law, signed under oath by an attorney licensed to practice in Thailand.  *See* Pet'r Ex. 1.  The Father did not present any evidence to rebut the Mother's affidavit of Thai law.

54.	The Mother's affidavit of Thai law establishes that the Mother and Father jointly have "parental power" over the children under Thai law by operation of law because they are the natural parents of the children.  According to the affidavit, section 1567 of the Civil and Commercial Code of Thailand provides that parental power includes:  (A) the right to determine the child's place of residence; (B) the right to punish the child in a reasonable manner for disciplinary purposes; (C) the right to require the child to do such work as may be reasonable to his ability and condition in life; and (D) the right to demand the return of the child from any person who unlawfully detains the child.

55.	Parental power under Thai law is considered a right of custody in accordance with Article 5(a) of the Hague Convention because it includes rights relating to the person of the child and to determine the child's place of residence.  The Mother has all of these substantive rights.

56.	Accordingly, the Mother has demonstrated by a preponderance of the evidence that she has rights of custody in Thailand under Article 5(a) of the Convention.  *See Bader v. Kramer*, 445 F.3d 346 (4th Cir. 2006) (holding joint rights of custody are considered "rights of custody" under Article 5(a) of the Hague Convention).

### E.	Exercising Rights of Custody

57.	The final element of the Mother's *prima facie* case is whether she was exercising her rights of custody at the time of the retention of the children.  What it means for a parent to exercise custody rights should be construed liberally.  *Sealed Appellant*, 394 F.3d at 344.

In the Fifth Circuit, a parent is deemed to be exercising her rights of custody even if she has only occasional contact with the child. *Id*. at 345. In order to prove that the Mother was not exercising her custody rights, the Father would have to establish that the Mother abandoned the children. *See id*.

58.     Here, there is no evidence that the Mother ever abandoned the children. On the contrary, the Mother exercised her lawful custody rights under Thai law at the time the Father retained the children in the United States. The Mother was fully involved in the children's daily life in Thailand. Moreover, upon learning that Respondent retained the children in the United States, on August 22, 2017, the Mother quickly filed an application under the Hague Convention on Civil Aspects of International Child Abduction provided by the Thai Central Authority. *See* Pet'r Ex. 14 & 15. Accordingly, the Court finds that the Mother was exercising rights of custody in Thailand.

59.     The Father points to an occasion where the Mother permitted the children to go, unescorted, to a Starbucks located in the same building in which they resided and claims that this is evidence of abandonment. The Court finds this insufficient proof of abandonment.

60.     Based on the foregoing, the Court concludes that the Mother has met her burden in establishing her *prima facie* case for the Court to order the return of L.J.F. and A.J.F. to Thailand. Finally, the Father urges the Court to entertain certain discretionary exceptions under the Hague Convention to retain the children in the United States.

F.      **Exceptions to Return Under the Hague Convention**

61.     "Faced with a *prima facie* case for return, the abducting parent may plead any of five "discretionary exceptions" to resist the return of the child: (1) the child has become "settled" in her new location after at least a year; (2) the left-behind parent has consented to or

acquiesced in the removal; (3) the child, of sufficient age and maturity, objects to the return; (4) the return would violate human rights and fundamental freedoms; and (5) the return would expose the child to "grave risk" of harm." Noah L. Browne, Note, *Relevance and Fairness: Protecting the Rights of Domestic-Violence Victims and Left-Behind Fathers Under the Hague Convention on International Child Abduction*, 60 DUKE L.J. 1193, 1201 (citations omitted).

62. "[T]he very nature of these exceptions gives judges a discretion—and does not impose upon them a duty—to refuse to return a child in certain circumstances." Explanatory Report, ¶ 113, at 460. Moreover, all discretionary exceptions are to be construed narrowly. *See Madrigal v. Tellez*, 838 F.3d 669, 676 (5th Cir. 2017).

63. Here, the Father has raised three of the five narrow discretionary exceptions: (i) mature child's objection, (ii) consent or acquiescence, and (iii) grave risk of harm.

### i. Mature Child's Objection

64. The Father argues that both children desire to remain in the United States.

65. The Court may decline to return a child to the child's habitual residence based on this exception only " . . . if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Rodriguez v. Yanez*, 817 F.3d 466, 473 (5th Cir. 2016); Hague Convention art. 13. The Father has the burden to establish by a preponderance of the evidence that this exception applies. *See* ICARA § 9003(e)(2)(B).

66. To satisfy this burden, the Father must "establish two distinct facts" with respect to each child. First, the Father must show that each child has reached an age and degree of maturity at which it is appropriate to take account of their views. Second, the Father must show that each child objects to returning to Thailand. *Rodriguez*, 817 F.3d at 473–74.

67.     The trial record does not support this exception.  First, the Court cannot ascertain whether each child has attained an age and degree of maturity at which it is appropriate to take account of their views.  Neither child was present at trial because neither parent listed them as a witness.[1]

68.     Both parents and the children's psychologist described the children as bright and smart.  But this is not enough to establish by a preponderance of the evidence that they are mature enough to make an informed determination, free from other's influence, to decide between Thailand and the United States or to choose between Mother and Father.

69.     Courts have rejected minor children's objection to return where those children fall within and above L.J.F. and A.J.F.'s age range of eight and ten.  *See, e.g.*, *England*, 234 F.3d at 272–73 (holding thirteen-years old not sufficiently mature for their views to be taken into account); *Lopez v. Alcala*, 547 F. Supp. 2d 1255 (M.D. Fla. 2008) (declining a ten-years old's alleged objection to return); *Mendoza v. Miranda*, 525 F. Supp. 2d 1182, 1199 (C.D. Cal. 2007) (finding a ten-years old is not of sufficient age and maturity for her view to be taken into account); *but see, e.g.*, *Escobar v. Flores*, 183 Cal. App. 4th 737, 750–51 (Cal. App. 3 Dist. 2010) (affirming trial court's refusal to return to Chile a nine-years old child, who was extremely communicative, was under no undue influence, and demonstrated sufficient age and maturity to take into account his objection); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1362 (M.D. Fla. 2002) (finding a nine-years old child had reached an age of maturity such that his views should be considered).

---

[1]     The Court commends the Mother and Father for this decision, a sign of thoughtful parenting.  Children are often victims when their parents' marriage sours, and testifying about a parent can be a bitter and traumatic experience.  Both parents seem to love their children dearly, protecting them from this courtroom battle.

70.     The Court did not have to opportunity to determine the children's maturity. Therefore, the Father has failed to meet his burden under this exception.

71.     Even if the children are sufficiently mature to indicate their preferences, the Court cannot determine the extent of the children's objection to returning to Thailand.  Because the children never testified at trial, the Father and grandparents' statements that the children prefer to stay in the United States are excluded under hearsay rules.  *See* Fed. R. Evid. 802.  The children's psychologist also indicated that the children prefer to stay in the United States.  As a treating physician, Dr. Kristen Luscher's testimony is admissible under Federal Rule of Evidence 803(4).

72.     Nonetheless, the Court accords little weight to any testimony about the children's preference.  After all, "[t]here is a recognized tendency for children to be influenced by the preferences of the parent with whom he or she lives."  Linda D. Elrod, *Please Let Me Stay: Hearing the Voice of the Child in Hague Abduction Cases*, 63 OKLA. L. REV. 663, 687 (2011) (internal citations omitted).  In this case, the children have been separated from their Mother since June 2017.  Meanwhile, for the past six months, the children have seemingly enjoyed their lives in the United States:  wizarding Harry Potter World in Orlando, Florida, *see* Resp't Ex. 7, attending the private Waldorf School of New Orleans, and living with two loving grandparents, their Father and other relatives.  A family court may afford the children's preference more weight; however, the Court's duty today is solely limited to determining the country where such custody proceeding should take place.

73.     Accordingly, the Father has not persuaded the Court to exercise its discretionary authority to cease the return of the children to Thailand based on the children's alleged objection.

## ii.    Consent or Acquiescence

74.    Under Article 13(a) of the Hague Convention, the Court is not bound to return a child if the Respondent establishes that the Petitioner consented to or subsequently acquiesced in the retention.  The Father must establish a consent or acquiescence exception by a preponderance of the evidence.  ICARA § 9003(e)(2)(B).  As with the other defenses, the consent and acquiescence exceptions must be drawn very narrowly.  *Larbie*, 690 F.3d at 308.

75.    Consent and acquiescence are different concepts and must be analyzed separately.  *Id.*

76.    On the one hand, the consent defense pertains to the left-behind parent's conduct prior to the contested removal or retention.  *Id.*  In considering the consent defense, the Court must consider "what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country."  *Id.* at 308–09.  This inquiry includes an examination of the nature and scope of the petitioner's consent, and any conditions or limitations.  *See id.*

77.    On the other hand, the acquiescence defense concerns whether the petitioner subsequently agreed to or subsequently accepted the removal or retention.  *See id.* at 308.  In considering the acquiescence defense, "'each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.'"  *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (quotations omitted).  The acquiescence defense requires formal evidence such as a custody order or other convincing written renunciation of rights.  *See Larbie*, 690 F.3d at 309.

78.    "Consent applies to pre-removal/retention activity and may be shown by less "formal" types of evidence, whereas acquiescence applies to post-removal/retention activity and generally requires more "formal" evidence such as a custody order or other "'convincing

written renunciation of rights." *Id.* at 309 n.14. "The formal renunciation of rights has been described more specifically as 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" *Munoz v. Ramirez*, 923 F. Supp. 2d 931, 957 (W.D. Tex. 2013) (quoting *Friedrich*, 78 F.3d at 1070).

79.     The Father argues that the Mother consented to the children residing and attending school in the United States before they left in June 2017. The objective evidence presented at trial nonetheless contradicts the Father's assertion. The children's roundtrip tickets clearly show that the children were scheduled to return to Thailand on August 13, 2017. The Father, however, points to the fact that the Mother sent the children's vaccination records to New Orleans at his request and suggests that this shows that the Mother consented to the children remaining in New Orleans. The Mother testified that she sent the vaccination records because she was concerned about the children's health. Moreover, the Father did not request from the Mother the children's vaccination record for school until August 2017. During the summer of 2017, the Mother repeatedly inquired about the Father's job search status, and whether she would need to come to New Orleans to accompany the children during their return trip. As the children's planned return date was fast approaching, the Father decided to retain the children in New Orleans. At trial, cross examination of the Father suggested that he never agreed with the Mother to allow the children to stay in the United States after the vacation was over.

| Mr. Cullen: | Let me ask you this. Why would you write the August 6th e-mail to your wife saying that I've decided to keep them here if there already had been an agreement that they were going to live here? |
| --- | --- |
| Mr. Ferdinand: | I didn't say that I decided to keep them here on August 6. |

24

| | |
|---|---|
| **Mr. Cullen:** | Let me be fair. |
| | You say, 'the kids really want to stay here, it's a good idea for them to stay. We've talked about this before and as I've said before, they've clearly outgrown the life Bangkok has to offer for over a year now . . . I think you should come down here.' |
| | This is you telling her the way it's going to be, isn't it? |
| **Mr. Ferdinand:** | It's a discussion. |

* * *

| | |
|---|---|
| **Mr. Cullen:** | There was never any shared agreement for you to keep the children here last summer and then you decide on your own what school they were going to because . . . that never happened, did it? |
| **Mr. Ferdinand:** | As I said before, these are constant ongoing conversations. |

Indeed, even if the parents has had prior conversations about plans to relocate or enroll the children in American schools, these conversations were "ongoing." No such plans were ever solidified. Therefore, based on the children's roundtrip tickets and the Mother's effort in retrieving the children, the Court finds the she never consented for the children to stay in the United States.

80.    Evidence that the Mother acquiesced to the Father keeping the children in the United States after August 13, 2017 is even more lacking. The Father rests his argument based on the informal Skype conversation with the Mother, in which she muttered "junior high and see about high school, junior high?" As mentioned earlier, although the Petitioner stated these words, she was under pressure, and she offered these statements in an effort to negotiate the prompt return of her children. No formal renunciation of her custody rights ever occurred.

81.     Accordingly, the Father has not shown that the Mother consented or acquiesced to the children staying in the United States for school or other reasons.

### *iii.* *Grave Risk of Harm*

82.     Finally, under Article 13(b) of the Convention, a court may decline to return a child  to her habitual residence if the respondent can establish, by clear and convincing evidence, that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. *See Soto v. Contreras*, No. 16-11541, 2018 WL 507802, at *4 (5th Cir. Jan. 23, 2018); *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (internal quotations omitted) (citing 42 U.S.C. § 11603(e)(2)(A)); Hague Convention, art. 13(b); *Eubanks*, 2017 WL 3235446, at *7.

83.     "[F]indings of grave risk are rare." *Delgado v. Osuna*, 2015 WL 5095231, at *13 (E.D. Tex. 28 Aug. 2015), *aff'd*, 837 F.3d 571 (5th Cir. 2016); *see also Soto*, 2018 WL 507802, at *4. "The person opposing the child's return must show that the risk to the child is grave, not merely serious."  Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494–01, 1986 WL 133056 (Mar. 1986).

84.     "The principles underlying the Hague Convention require the 'grave risk must be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes.'" *Soto*, 2018 WL 507802, at *4 (citing *Tavarez v. Jarrett*, 252 F. Supp. 3d 629, 640 (S.D. Tex. 2017).  "In that regard, courts in Hague Convention cases 'must strive always to avoid a common tendency to prefer their own society and culture'; the Hague Convention 'deter[s] child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes.'" *Id.* (quoting *Abbott*, 560 U.S. at 20).

85.     The Father rests his defense of grave risk of harm based on alleged physical and psychological harms caused by the Mother.

86.     The Father provided testimony of certain isolated incidents where the Mother would leave the children alone, and as forms of punishment, slap them with an open palm, squeeze their jaws, and lock them out of the condominium or place them on the balcony while they were only wearing underwear to "teach them a lesson." The Father also alleged that the Mother's distrust of western medicine poses harm to the children. The Mother denied these allegations or criticized the Father for exaggerating the incidents.

87.     At trial, Respondent called Dr. Kristen A. Luscher as an expert witness and the children's treating clinical psychologist. Petitioner stipulated to Dr. Luscher's credentials as an expert in the field of clinical psychology with an emphasis in trauma.

88.     Dr. Luscher received her Ph.D. in clinical psychology from the University of Georgia in 2001. She is currently in independent private practice and provides psychological services, including individual and couples psychotherapy, psychological assessments, forensic assessments, and consultation for children, adolescents, and adults. *See* Resp't Ex. 6.

89.     Dr. Luscher examined L.J.F. and A.J.F. several times in the past four months. The first session occurred on October 12, 2017, conducted at the request of the Father, to determine whether his children were adjusting to the United States. At the end of the session, Dr. Luscher concluded that she "didn't see any problems." Dr. Luscher stated: "They seemed well adjusted. So I didn't recommend that they needed to . . . go on with therapy unless there was something that came up."

90.     The second session occurred on January 5, 2018, also at the request of the Father. According to Dr. Luscher, the Father was allegedly "concerned about how [the children]

were functioning, that there had been, there was now some litigation that was going on to determine jurisdiction, and that he was concerned about the children's reactions and how they were doing particularly after [the children] sp[oke] with their mother." The Father told Dr. Luscher that he "had seen changes in [the children's] functioning and wanted . . . to see how they were doing." During this session, Dr. Luscher explained that the children had told her they wanted to remain in the United States, and wanted "her mom to visit or to move here . . . but [A.J.F.] knew her mother wanted her to come to Thailand."

91.    The third session occurred on January 15, 2018. During this meeting, the children mentioned to Dr. Luscher certain harsh parenting methods by the Mother, such as "a lie will send you out of the house naked." At trial, Dr. Luscher described this conversation with the children:

| | |
|---|---|
| **Dr. Luscher:** | And so I asked her, you know, she said that if you lie, you get sent out of the house naked and into the street.  And I was confused.  I mean, I wasn't sure what she was talking about.  And I asked her, I said are you talking about something that's happened to you? |
| | And she said, 'Yes, it happened a lot.' |
| | And I said -- |
| | And she said, 'You know, she sends us out of the house.' |
| | And I said who sends you out of the house. |
| | And I was like -- and then she said her mother sends her out of the house.  She said the mother sends her out a lot. |
| | And so then there was, again, I wasn't quite sure what she was stating and asked if she could explain it to me.  And she explained that she was sent out onto the balcony in |

28

> either her underwear or she was sent out of
> the house without clothes on and then the
> oldest child also explained that that had
> happened, happened to her once or twice but
> more the youngest child.

92.     Believing that the law compelled her to report abusive incidents, Dr. Luscher contacted the Louisiana Department of Family and Children Services, and conveyed the children's descriptions to the state agency.  The Department responded that her report did not meet the legal and policy definitions of child abuse and neglect.

93.     The fourth session occurred on January 19, 2018.  During this meeting, the children reportedly conveyed to Dr. Luscher that they know about the Mother's upcoming visit. Dr. Luscher explained that L.J.F. was more neutral, but the situation with A.J.F. (the eight year old) was more worrisome.  Dr. Luscher testified that A.J.F. had the emergence of anxiety-related symptoms.  Moreover, according to Dr. Luscher, A.J.F. also made "suicidal statements, although they were vague" and reported nightmares.  Nonetheless, Dr. Luscher concluded, "It's too early to understand yet if those are just related to the experience or if she has enough to meet a diagnosis of an acute stress reaction or post-traumatic stress disorder."

94.     Dr. Luscher also met with A.J.F. on January 25, 2018 after the Father called her for an emergency session when the youngest daughter underwent some rebellious episodes and made suicidal statements.

95.     Based on the testimony at trial, the Court cannot conclude by clear and convincing evidence that returning the children to Thailand would pose grave risk of harm.  The Father and Mother both dispute whether isolated violent incidents as forms of parenting occurred. Without more, the Court cannot determine the seriousness of the alleged abuse by the Mother. And even if the Court was to take the Father's words as true, the incidents described still do not

amount to the high standard of grave risk of harm. "A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in 'immediate danger prior to resolution of the underlying custody dispute.'" *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 575–76 (W.D. Tex. 2013) (quoting *Friedrich*, 78 F.3d at 1069). "Examples of such immediate danger include 'returning the child to a zone of war, famine, or disease.'" *Id.* (quoting *Friedrich*, 78 F.3d at 1069); *Sanchez v. Sanchez*, No. SA–12–CA–568, 2012 WL 5373461, at *10–11 (W.D. Tex. Oct. 30, 2012).

96. In returning the children to Thailand, the Court is not placing them in any imminent danger. Instead, the Court is merely restoring the status quo prior to the children moving to the United States, sending them back to a country where they had lived for six years. That is precisely the intended remedy of the Hague Convention. *See Sealed Appellant*, 394 F.3d at 344 ("The Convention was designed to 'restore the pre-abduction status quo.'"). Moreover, if the Father is indeed concerned about the safety of the children, he could accompany them to Thailand until the custody issue is settled.

97. Dr. Luscher testified as to the children's fragile psychological health, especially A.J.F.'s upsetting state of mind. Nonetheless, even Dr. Luscher acknowledges that her assessments of the children are in its preliminary stage. Dr. Luscher has never spoken with the Mother; thus, she has never corroborated the children's account of their stories, or directly and confidently traced the children's psychological conditions to their Mother's alleged abuse. And it is suspicious, although admittedly not conclusively so, that the Father repeatedly contacted Dr. Luscher for the children's diagnosis and treatment only after the instant lawsuit commenced, even after Dr. Luscher had indicated in October 2017 that the children were well-adjusted in New Orleans. Regardless, the Court cannot directly trace the children's symptoms of anxiety or

potentially suicidal thoughts to the Mother or her parenting.  An equally plausible cause is the pressure—from the parents' custody battle and marital discord—on the children.  At this point, any causation of psychological disorders is speculative at best.

99. Accordingly, the Father has not proved by clear and convincing evidence that returning the children to Thailand would create grave harm to L.J.F. and A.J.F.  Furthermore, if the parents are concerned, the Mother—or Father—could continue to seek psychological help for the children in Thailand.

99. Considering the aforementioned, the Court concludes that none of the discretionary exceptions applies to the children's return.  Because the children's habitual residence prior to their wrongful removal and retention is Thailand, the Court hereby **ORDERS** the return of L.J.F. and A.J.F. to Thailand.

### G. <u>Attorney's Fees and Costs</u>

100. Petitioner has requested attorney's fees and costs pursuant to Article 26 of the Convention and 42 U.S.C. § 11607(b).

101. In a case arising under the Convention, ICARA requires that "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster homes or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."  42 U.S.C. § 11607(b)(3).

102. It is the Respondent's burden to show that an award of attorney fees, expenses, and costs would be "clearly inappropriate."  *Saldivar*, 879 F. Supp. 2d at 632 (quoting *Whallon*, 356 F.3d at 140).

103.    Accordingly, because the Court has determined the habitual residence of the children to be Thailand, and thus grants the Mother's petition, the Court concludes that the Mother is entitled to recovering attorney's fees and costs.

## VI.    CONCLUSION

The Supreme Court has instructed:  "When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply."  *Abbott*, 560 U.S. at 8 (citing Article 12 of the Hague Convention).  No exceptions apply here.

Based on the foregoing reasons, accordingly,

**IT IS ORDERED** that Petitioner's Verified Complaint for Return of Children to Thailand (R. Doc. 1) is hereby **GRANTED**.  L.J.F. and A.J.F. shall return to Thailand, their country of habitual residence.  The children's passports are hereby released to Petitioner to effectuate the children's return to Thailand.  Respondent may also retrieve his own passport.  The parties are hereby instructed to contact Chambers to retrieve their passports.

**IT IS FURTHER ORDERED** that Respondent and any person acting in concert or participating with him are prohibited from taking any action to remove the children outside of the Eastern District of Louisiana.  The parties shall promptly and diligently coordinate, in good faith, the return of the children to Thailand.

**IT IS FURTHER ORDERED** that Respondent pays certain necessary expenses and attorney fees pursuant to 42 U.S.C. § 11607(b)(3).  The award of attorney's fees and costs under 42 U.S.C. § 11607(b)(3) is contingent upon Petitioner filing, within twenty-one (21) days of this Order, an itemization of all costs requested and a brief detailing the services rendered.  Fed. R. Civ. P. 54(d)(2)(B)(i).  Respondent shall have seven (7) days from date of service of Petitioner's

itemization and brief to file a response, asserting why the requested award is "clearly inappropriate" under 42 U.S.C. § 11607(b)(3). In particular, Respondent shall state his income, any financial assets, necessary expenses, and his out-of-pocket litigation fees and costs associated with this lawsuit. Afterward, Petitioner may file a reply brief to Respondent's response within five (5) days from date of service of Respondent's brief. The Court will then determine the appropriate monetary award of attorney's fees and costs.

New Orleans, Louisiana, this 5th day of February, 2018.

**ELDON E. FALLON**
United States District Judge